**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **CHRISTENE TANKSLEY** | ) |
| | ) |
| **Plaintiff,** | ) |
| vs. | ) No.  **3:12-CV-02050-BH** |
| | ) |
| **CAROLYN W. COLVIN, ACTING** | ) |
| **COMMISSIONER OF THE SOCIAL** | ) |
| **SECURITY ADMINISTRATION,** | ) |
| | ) |
| **Defendant.** | ) |

**MEMORANDUM OPINION AND ORDER**

Pursuant to the consent of the parties and the *Order of Transfer* dated September 18, 2012, this case has been transferred for all further proceedings and entry of judgment. Before the Court are *Plaintiff's Motion for Summary Judgment*, filed December 17, 2012 (doc. 21), and *Defendant's Motion for Summary Judgment*, filed January 16, 2013 (doc. 24).  Based on the relevant filings, evidence, and applicable law, Plaintiff's motion is **GRANTED,** Defendant's motion is **DENIED,** and the case is **REMANDED** to the Commissioner for further proceedings.

### I.  BACKGROUND[1]

**A.    Procedural History**

Christene Tanksley (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claims for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act.  (R. at 1–4.) On August 31, 2006, Plaintiff applied for DBI, and on September 19, 2006, she applied for SSI,

---

[1] The background information comes from the transcript of the administrative proceedings, which is designated as "R."

- 1 -

alleging disability beginning August 22, 2006, due to obesity, headaches, depression, and arthritis. (R. at 128, 132, 161.) Her applications were denied initially and upon reconsideration. (R. at 135–36.) She requested a hearing before an Administrative Law Judge (ALJ), and personally appeared and testified at a hearing held on March 8, 2008. (R. at 82.) After the ALJ rendered an unfavorable decision, the Appeals Council remanded the case and ordered a new hearing because the transcript of the first hearing was missing from the record. (R. at 95–96.) On January 5, 2010, Plaintiff appeared and testified at a second hearing. (R. at 28–69.) The ALJ denied her applications on May 28, 2010, and the Appeals Council denied her request for review on April 23, 2012, making the ALJ's decision the final decision of the Commissioner. (R. at 1–4.) Plaintiff timely appealed the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (doc. 1.)

**B.     Factual History**

    **1.     Age, Education, and Work Experience**

Plaintiff was born on January 1, 1965, and was 45 years old at the time of the second hearing before the ALJ. (R. at 128.) She graduated from high school and received some college-level education. (R. at 37.) She has past relevant work as a secretary, receptionist, tax clerk or tax preparer, file clerk, assembler, store clerk, and custodian. (R. at 62, 199, 215.)

    **2.     Medical, Psychological, and Psychiatric Evidence[2]**

From October 2006 to the date of the hearing, Plaintiff received psychological and psychiatric treatment from various providers, including LifePath Systems, Collin County Mental Health Mental Retardation Center, psychologist Dr. Lynn Price, and the Child and Family Guidance Center. (*See* R. at 299–300, 305, 309–13, 342, 348, 456, 465–68, 535–41, 691–99.) She was

---

[2] Because the determination of this action does not depend on any medical, psychological, or psychiatric evidence, only a brief summary of Plaintiff's treatment history is included.

repeatedly diagnosed with major depressive disorder and substance abuse (in remission), assigned Global Assessment of Functioning (GAF) scores ranging from 40 to 50,[3] and prescribed antidepressants. (*See, e.g.*, 348, 541, 606–19, 671–89.)

Between October 18, 2006 and July 13, 2009, Plaintiff underwent several consultative examinations regarding her physical ailments of degenerative disk disease, morbid obesity, hypertension, and diabetes mellitus. (R. 254–55, 633–41.)

On November 20, 2006, Moira Dolan, M.D., a state agency medical consultant (SAMC), reviewed Plaintiff's medical records and completed a physical Residual Functional Capacity (RFC) assessment. (R. at 262–69.) Dr. Dolan determined that Plaintiff had the following physical RFC: lift and carry 10 pounds occasionally and less than 10 pounds frequently; stand and walk for at least 2 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; push and pull an unlimited amount of weight; frequently balance and stoop; occasionally climb ramps, stairs, ladders, ropes, and scaffolds; occasionally kneel, crouch, and crawl; and no manipulative, visual, communicational, or environmental limitations. (R. at 262–67.)

That same day, Murray Lerner, Ph.D., another SAMC, reviewed Plaintiff's treatment records and completed a Psychiatric Review Technique Form (PRTF) and a mental RFC assessment. (R. at 258–60, 270–82.) In his PRTF, Dr. Lerner opined that Plaintiff had mild restrictions in her activities of daily living and maintaining concentration, persistence, or pace; and a moderate restriction in maintaining social functioning; and had experienced one to two episodes of decompensation of extended duration. (R. at 280.) He concluded that Plaintiff had the mental RFC

---

[3] GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health. *Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001). A GAF score of 41 to 50 indicates serious symptoms, such as suicidal ideations and severe obsessional rituals, or any serious impairment in social, occupational, or school functioning, such as having no friends or being unable to keep a job. *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 34 (4th ed., text rev. 2000).

to "understand, remember, and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with co-workers and supervisors, and respond appropriately to changes in [a] routine work setting." (R. at 260.)

From November 28, 2006, until the time of the hearing before the ALJ, Plaintiff saw Don McCord, M.D., her treating physician, for her depression, morbid obesity, bleeding hemorrhoids, anal fissure, osteoarthritis, radiculopathy of her left arm, diabetes mellitus, migraine headaches, and uncontrolled hypertension. (R. at 285, 288–95, 339, 562–63, 571–77, 656–60.)

Beginning on January 9, 2007, Plaintiff received vocational counseling through the Texas Department of Assistive and Rehabilitative Services (DARS). (R. at 618.) She attended at least nine sessions through December 2009. (R. at 606–19, 671–89.)

Plaintiff also underwent several consultative psychological evaluations. (*See, e.g.*, R. at 250–52, 593–605, 649–54.) At least two consultants opined that she needed on-going psychological treatment to address her depression and substance abuse cravings. (R. at 594–95, 650–51.)

### 3. Hearing Testimony

On January 5, 2010, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 28–69.) Plaintiff was represented by an attorney. (R. at 33.)

#### *a. Plaintiff's Testimony*

Plaintiff testified that she was 45 years old and had one child under age 18. (R. at 36–37.) She was five feet and six inches tall and weighed 360 pounds. (R. at 37.) She completed high school and "some college", and presently worked at Jackson Hewitt as a "tax preparer." (*Id.*) She had worked as a tax preparer the previous year. (R. at 38.) The job consisted of entering her clients' tax information "into the computer" using a software program. (*Id.*) She began work at around noon and stayed until 4:00 or 5:00 p.m., three or four days a week. (R. at 38–39.) The work was

- 4 -

"tiring" on her mind and body, and she got headaches and was cranky, irritable, and achy at the end of her shift. (R. at 39, 57.) She prepared between four to six tax returns per day. (R. at 41.) Mentally, the work was easy because it was just "like data entry," and she was "smart enough to do it." (*Id.*) She did not like that her manager tried "to push [her]" by making her work longer hours or "do stuff like vacuum the whole office." (*Id.*)

Plaintiff had difficulty getting along with others because she did not know what they expected of her and felt that they were watching and judging her. (R. at 42.) While her co-workers "s[a]t there and laugh[ed] and joke[d] with their clients," she entered her clients' "information into the computer" and spoke to them only when she "need[ed] an answer." (R. at 42.) She could not do a job that required interacting with the public all day due to her anxiety. (R. at 43.)

Before working at Jackson Hewitt, Plaintiff worked as a church secretary until they fired her because she requested a pay raise. (R. at 44.) "Tension had been building up for . . . probably two years . . . between [her] and the manager." (R. at 45.) Her manager did not respect her opinion and treated her "badly." (*Id.*) There was also "a conflict between the pastor and the church" and she was "caught in the middle." (R. at 45–46.) The pastor was fired for conducting Plaintiff's wedding ceremony via a "proxy" because her husband was in prison. (R. at 46.) They later fired her as well because her "work could have been better." (*Id.*) For example, if she "didn't feel good one day, [she] . . . rearrange[d] [her] schedule . . . [to] take a nap," and she often requested help from friends and family with certain tasks. (R. at 55.) She needed help with her job because she was tired and "just fatigued." (*Id.*) She did not want to quit her job because she had a child and knew she would not be "able to get any kind of assistance." (R. at 48.) She therefore requested a raise, knowing they would let her go after that. (*Id.*)

Plaintiff could not do any other job, even a less stressful job, because she was physically

"tired." (R. at 49.) She could not work an 8-hour shift because it was "just very tiring." (*Id.*) She got fatigued "just focusing on the computer, concentrating, [and] trying to interact [with] people." (R. at 49–50.) Even if a job consisted of "inspecting widgets" without using a computer or interacting with others, she still had to "worry about [her] legs going to sleep or [her] back hurting." (R. at 50.) She could not stand for even an hour, but could lift and carry up to 10 pounds. (R. at 51.)

Plaintiff took a diuretic for her fluid retention and her high blood pressure. (*Id.*) Her fluid retention occurred mostly in her legs and ankles. (R. at 54.) She had taken medication for her lower back pain in the past, but stopped taking it due to its side effects. (R. at 52.) She "just [lay] down" to "deal with the pain." (*Id.*) Her diabetes was "under control." (*Id.*) Her obesity was "the cause of [her] back problems," contributed to her diabetes and blood pressure, and affected her "mental state." (R. at 56.)

Plaintiff received counseling and took antidepressants for her depression. (R. at 53.) Her counselor at DARS referred her to a psychiatrist, an endocrinologist, a physical therapist, and a "weight-loss doctor." (R. at 54.) DARS would also pay for her bariatric surgery. (*Id.*) Her anxiety medication made her drowsy, causing her to sleep up to 15 hours at times. (R. at 57–58.) Her "vocational" goal at DARS was to "be able to support [her]self again," and start her own business. (R. at 58.) She knew she was "smart" enough to work, she just got "overwhelmed and tired" mentally and physically. (*Id.*)

Plaintiff had smoked marijuana on a daily basis until 2006. (R. at 59.) She had "one slip up" in 2007, but had been sober ever since. (*Id.*) Between 2007 and 2008, she underwent random drug tests at DARS, which were negative. (R. at 59–60.) She cut down on her smoking but never tried quitting altogether, even though she knew it was a problem. (R. at 60.)

### b.     *Vocational Expert Testimony*

The VE classified Plaintiff's past relevant work as a tax clerk or preparer (sedentary, specific vocational preparation (SVP) level-3), church secretary (sedentary, SVP-5), store clerk (light, SVP-3), file clerk (light, SVP-3), receptionist (sedentary, SVP-3), assembler (light, SVP-2), and school custodian (medium, SVP-2).  (R. at 61–62.)

The ALJ asked the VE to opine whether a hypothetical person with Plaintiff's age, education, and work experience could perform Plaintiff's past relevant work if she had the following limitations: lift and carry 10 pounds occasionally and less than 10 pounds frequently; stand and walk for at least 2 hours in an 8-hour workday; occasionally climb ramps and stairs; occasionally balance stoop, kneel, and crouch; never crawl or climb ladders, ropes, or scaffolds; and have no more than occasional contact with the general public and co-workers.  (R. at 62–63.) The VE opined that the hypothetical person could perform Plaintiff's past relevant work as a secretary.[4]  (R. at 63.)  The VE further opined that the person could perform the jobs of calculating machine operator[5] (sedentary, SVP-3), with 23,277 jobs in Texas and 294,989 in the national economy; data entry clerk[6]

---

[4] Compiles and maintains membership lists, records receipts of dues and contributions, and gives information to members of [a] nonprofit organization: Compiles and maintains membership lists and contribution records. Welcomes new members and issues membership cards. Explains privileges and obligations of membership, discusses organization problems, addresses complaints, and provides other information to members. Types and sends notices of membership dues. Collects and records receipts of dues and contributions. Sends newsletters, promotional materials, and other publications to persons on mailing list. May prepare and distribute monthly financial reports to department heads. May assign numbers and codes to new corporate and individual members and input billing schedule into computer. May revise existing membership records, compile list of delinquent dues, and forward information to president.  *See* http://www.oalj.dol.gov/libdot.htm (last visited September 18, 2013).

[5] Computes and records statistical, accounting and other numerical data, utilizing knowledge of mathematics and using a machine that automatically performs mathematical processes, such as addition, subtraction, multiplication, division, and extraction of roots: Calculates statistical, accounting, and other numerical data, using a calculating machine, and posts the totals to records, such as inventories and summary sheets. May verify computations made by other workers . . . . May compute and record inventory data from audio transcription, using a transcribing machine and [a] calculator, and be designated Inventory Transcriber (business ser.).  *Id.*

[6] Operates a keyboard or other data entry device to enter data into computer or onto magnetic tape or disk for subsequent entry: Enters alphabetic, numeric, or symbolic data from source documents into a computer, using data entry device, such as keyboard or optical scanner, and following format displayed on screen . . . . May compile,

(sedentary, SVP-4), with 11,076 jobs in Texas and 133,950 in the national economy; and charter[7] (sedentary, SVP-3), with 18,566 jobs in Texas and 1,045,529 in the national economy. (R. at 64.) In response to a question by the ALJ, the VE testified that her testimony did not conflict with the Dictionary of Occupational Titles (DOT). (*Id.*)

The ALJ modified the hypothetical by adding the following limitations: occasionally lift and carry 10 pounds; stand and walk for less than 2 hours in an 8-hour workday; and sit for less than 6 hours in an 8-hour workday. (*Id.*) The VE testified that these limitations would eliminate Plaintiff's past relevant work, as well as the three jobs the VE identified. (R. at 65.)

In response to counsel's question, the VE testified that a finding that a person had "a substantial impediment to employment" meant that she had "some limitations defined in competitive employment" that must be eliminated "as much as possible to bring the [person] back to being able to sustain competitive employment." (*Id.*) DARS "purchased" "services" from psychiatrists and other medical providers "to try to ultimately get that [person] back to work." (R. at 66.)

Counsel then added the following limitations to the ALJ's first hypothetical: never climb stairs, ramps, ladders, or scaffolds, and never balance, stoop, kneel, crouch, or crawl. (*Id.*) The VE opined that the limitations would eliminate Plaintiff's past relevant work as secretary, as well as the three jobs she identified. (R. at 67.) Counsel next added the following "non-exertional limitations": seriously limited "but not precluded" in the ability to use judgment, interact with supervisors, deal

---

sort, and verify the accuracy of the data to be entered. May keep record of work completed. *Id.*

[7] Observes horseraces, calls out description of race to other workers, and records statistical and related data on race for use in racing publication: Focuses binoculars on distance markers along track during race and calls out [the] horses' numbers, positions, estimate of distances of horses from inside rail and between horses, and related observable data for other workers to record. Revises record of order and distance between horses at finish line if different from intercom announcement of official results. Copies identifying information, such as the horses' names and drivers, from racing form onto record. Transcribes race results, such as winning and intermediate times, purse, and prices paid to bettors from the tote board onto the record. Contacts judges, using intercom, for decisions on foul claims and notes record accordingly. Computes race completion times for all but winning horses, using a formula. Mails completed record to printer for use in printing race results in racing publications. *Id.*

with work stress, and relate predictably in social situations—these limitations were consistent with a "sheltered workshop" but not with competitive job placement. (*Id.*) The VE opined the limitations would eliminate all of Plaintiff's past relevant work and the three jobs the VE identified. (*Id.*)

## C.     **ALJ's Findings**

The ALJ issued his decision denying benefits on May 28, 2010. (R. at 10–28.) At step one, he found that Plaintiff met the insured status requirements through December 1, 2010, and had not engaged in substantial gainful activity since August 22, 2006, her alleged onset date. (R. at 12.) At step two, he found that Plaintiff had six severe impairments: morbid obesity, degenerative disc disease, diabetes mellitus, hypertension, affective disorder, and anxiety disorder (not otherwise specified). (*Id.*) At step three, he found that Plaintiff's impairments did not satisfy the severity criteria of any impairment listed in the social security regulations. (*Id.*)

Before proceeding to step four, the ALJ determined that Plaintiff had the RFC to perform "a restricted range of sedentary work" with the following limitations: lift and carry 10 pounds occasionally and less than 10 pounds frequently; walk and stand for 2 hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; occasionally climb stairs, kneel, and crouch; and have occasional contact with the public and coworkers. (R. at 17.) At step four, the ALJ determined that Plaintiff could not perform any of her past relevant work. (R. at 19.) At step five, based on the VE's testimony, the ALJ determined that the skills Plaintiff acquired from her past relevant work as a secretary were "transferable to other occupations with jobs existing in significant numbers in the national economy." (R. at 20.) Accordingly, the ALJ determined that Plaintiff was not disabled, as the term is defined under the Social Security Act, at any time between her alleged onset date and the date of the ALJ's decision. (*Id.*)

## II. ANALYSIS

### A. Legal Standards

#### 1. Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether there is substantial evidence to support the Commissioner's decision. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343–44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *See id*.

### 2.     Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled. If the individual is found to have severe impairment, then step three should be considered.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. If the individual does not meet listed impairment, step four should then be considered.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made. If unable to perform such work, an RFC determination should be made and step five should be considered.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, and past work experience must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)–(f)) (currently 20 C.F.R. § 404.1520(a)(4)(I)–(v) (2012)). Under the first four steps

of the analysis, the burden lies with the claimant to prove disability in the relevant time period. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.** **Issue for Review**

Plaintiff presents one issue for review:

The regulations and rulings require consideration of a claimant's ability to adjust to other work in the national economy; including an explanation how work skills are acquired and to what jobs the skills may be transferred. In response to the hypothetical question—incorporating the RFC relied on by the ALJ—the vocational expert only identified semi-skilled jobs. Is the vocational expert's testimony substantial evidence to support the Commissioner's Step 5 burden—if neither the ALJ nor the VE identified [Plaintiff's] transferable skills and explained how they could be used in the described work?

(Pl. Br. at 2, 15.)

**C.** **Transferable Skills**

Plaintiff contends that remand is required because the Commissioner failed to carry her burden at step five of the sequential evaluation process to show Plaintiff was not disabled. (Pl. Br. at 15–21.) She argues that the ALJ relied on the VE's testimony that she could not perform her past relevant work but could perform other jobs at the semi-skilled level, but neither the VE nor the ALJ

identified the specific skills that she allegedly acquired in her past relevant work or explained how those skills were transferable to the jobs identified by the VE. (*Id.* at 19.)

### 1. *Lack of Transferability Findings*

Once the claimant establishes at step four that she is unable to perform any of her past relevant work, the burden shifts to the Commissioner at step five to show "that there is other gainful employment available in the national economy that the claimant is capable of performing." *Yanez v. Colvin*, No. 3:12-CV-1796-K, 2013 WL 4766836, at *8 (N.D. Tex. Sept. 5, 2013) (citing *Greenspan*, 38 F.3d at 236). To guide this determination, the Commissioner promulgated the medical-vocational guidelines (Guidelines or Grids).[8] *Smith v. Astrue*, No. 3:08–CV–1241-N, 2009 WL 1203407, at *9 (N.D. Tex. May 1, 2009). If the claimant's impairments are solely exertional, or her nonexertional impairments do not sufficiently affect her RFC, the Commissioner may rely exclusively on the Guidelines to make a step five determination. *Id.* (citing *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000)). On the other hand, "[w]here a claimant cannot perform the full range of a specific level of work activity or has significant nonexertional impairments, the ALJ may not mechanically apply the Grids, although they may be used as a framework." *Rivera v. Astrue*, No. CIV.A.6:08-CV-075-C, 2010 WL 711717, at *4 (N.D. Tex. Mar. 2, 2010). In that case, the ALJ must "make an individualized determination of the claimant's ability to perform specific jobs in the national economy" by obtaining testimony from a VE. *Id.*; *Yanez*, 2013 WL 4766836, at *8.

Before a claimant under age 45 (a "younger individual")[9] who does not "have the ability to

---

[8] The Guidelines are divided into age categories, and the determination of whether an individual is presumptively disabled differs depending upon the age category and other factors. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 (2008).

[9] Because Plaintiff was 41 years old at the time of her alleged onset date, the ALJ determined that she was "a younger individual" for purposes of the Guidelines. (R. at 19); *see also* 20 C.F.R. § 404 App. 2 § 201.00(h)(1).

perform a full range of sedentary work" is found to be disabled, the ALJ must consider "the impact of the limitations or restrictions on the number of sedentary, unskilled occupations or the total number of jobs to which the [claimant] may be able to adjust, considering his or her age, education and work experience, *including any transferable skills*[10] or education providing for direct entry into skilled work." 20 C.F.R. 404 Subpt. P. App. 2 § 201.00(h)(1)(3) (2008) (emphasis added). Consequently, whether a claimant is or is not disabled may sometimes depend solely on whether he or she has skills that are "transferable" to other jobs. *Id.*; *Muehling v. Colvin*, No. 2:12-CV-013, 2013 WL 1194078, at *5 (N.D. Tex. Mar. 6, 2013), *rec. adopted*, 2013 WL 1197740 (N.D. Tex. Mar. 25, 2013) ("If [the claimant] has transferable skills, she is not disabled; if she does not have transferable skills, she is disabled.") (citing to 20 C.F.R. 404 Subpt. P. App. 2 § 201.00).

A claimant's skills are transferable when "the skilled or semi-skilled work activities that he has done in the past can be used to meet the requirements of skilled or semiskilled work activities of other jobs or kinds of work." 20 C.F.R. § 404.1568(d)(1), 416.968(d)(1). "The transferability of skills depends largely on the similarity of occupationally significant work activities among the different jobs." *Jeffcoat v. Sec'y of Health & Human Servs.*, 910 F. Supp. 1187, 1194 (E.D. Tex. 1995) (citing 20 C.F.R. § 404.1568(d)(1)). Transferability "is most probable or meaningful with jobs where the same or lesser degree of skill is required because people are not expected to do more

---

[10] A skill is "knowledge of a work activity which requires the exercise of significant judgment that goes beyond the carrying out of simple job duties and is acquired through performance of an occupation which is above the unskilled level (requires more than 30 days to learn )." Social Sec. Ruling (SSR) 82–41,1982 WL 31389, at *2 (Social Security Administration (SSA) 1982). "It is practical and familiar knowledge of the principles and processes of an art, science or trade, combined with the ability to apply them in practice in a proper and approved manner." *Id.* Examples of skills are "activities like making precise measurements, reading blueprints, and setting up and operating complex machinery." *Id.*

complex work than they have previously performed."[11]  *Rivera*, 2010 WL 711717, at *4 (citing 20 C.F.R. § 404.1568(d) and SSR 82–41).

Notably, as SSR 82-41 explains, "[t]ransferability of skills is an issue only when an individual's impairment(s), though severe, does not meet or equal the criteria" of a listed impairment "but does prevent the performance of past relevant work [], and that work has been determined to be skilled or semiskilled."  SSR 82-41, 1982 WL 31389, at *1.  "When the issue of skills and their transferability must be decided, the . . . ALJ is required to make certain findings of fact and include them in [his] written decision . . . ."  *Id.* at *7.  If a claimant is found to have "transferable skills, the acquired work skills *must be identified*, and specific occupations to which the acquired work skills are transferable must be cited in the . . . ALJ's decision."  *Id.*

The Fifth Circuit has not yet determined whether an ALJ commits error at step five by relying on a VE's testimony that the claimant can perform other jobs, but neither one identifies the claimant's skills that are transferable to those jobs.[12]  Here, the Commissioner essentially concedes

---

[11] This is the case where: "(i) the same or lesser degree of skill is required; (ii) the same or similar tools and machines are used; and (iii) the same or similar raw materials, products, processes or services are involved."  20 C.F.R. § 404.1568(d)(2); SSR 82-41, 1982 WL 31389, at *5.  Notably, "a complete similarity of all three factors is not necessary for transferability."  20 C.F.R. § 404.1568(d)(3).

[12] Several district courts in this Circuit have held in the affirmative.  *See, e.g.*, *Muehling*, 2013 WL 1194078, at *4 (finding that the VE's testimony that the claimant had transferable "customer service skills" was "insufficient" to support the ALJ's transferability determination because the ALJ did not solicit testimony from the VE, or otherwise make independent findings, regarding the definition of a "customer service skill" or its transferability "to the jobs listed by the VE"); *S.W.O. v. U.S. Com'r Soc. Sec. Admin.*, No. 11-CV-0067, 2012 WL 967775, at *4 (W.D. La. Mar. 2, 2012), *rec. adopted*, 2012 WL 966167 (W.D. La. Mar. 20, 2012) (finding reversible error where the ALJ did not make explicit transferability findings and there was "no evidence about either the skills [the] Plaintiff gained from her past relevant work or whether those skills would transfer to the job identified by the VE"); *Rivera*, 2010 WL 711717, at *5 (holding that the ALJ erred by failing to make a proper transferability determination; explaining that on remand, the ALJ should develop the record to "includ[e] information regarding whether [the] Plaintiff acquired transferable skills from her past work and identi[fy] [] such skills").  These holdings are supported by the regulations and relevant rulings, which make evident that a claimant acquires transferable skills from his or her personal work experience.  *See* 20 C.F.R. § 404.1565(a) (2012) ("Work you have *already been able to do* shows the kind of work that you may be *expected to do*.") (emphasis added); SSR 83-10, 1983 WL 31251, at *3 (S.S.A 1983) (The "[a]bility to perform skilled or semiskilled work depends on the presence of *acquired skills* which may be transferred to such work from [the claimant's] *past job experience* above the unskilled level . . . .").

that the ALJ erred in failing to identify Plaintiff's acquired skills when making his transferability determination, arguing instead that she was not prejudiced by the failure.[13] (D. Br. at 7).

### 2. *Prejudice*

Because "[p]rocedural perfection in administrative proceedings is not required," and a court "will not vacate a judgment unless the substantial rights of a party are affected," remand is warranted only if Plaintiff was prejudiced by the ALJ's failure to identify her acquired skills and explain how they were transferable to the jobs cited by the VE. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam). "Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)). Accordingly, Plaintiff must show that the ALJ might have reached a different disability determination if he had made the transferability findings required by SSR 82-41. *See id.*

The Commissioner contends that the ALJ's error was not prejudicial because Plaintiff's RFC limitations to "a restricted range of sedentary work" and "occasional contact with the public and co-workers" "did not significantly erode the sedentary occupational base," and therefore the ALJ could have relied solely on the Guidelines at step five. (D. Br. at 5–6.) In essence, the Commissioner argues that the ALJ would have reached the same disability determination even without obtaining testimony from the VE regarding Plaintiff's ability to perform her past relevant work or other work existing in the national economy. (*See id.*)

---

[13] The ALJ found that Plaintiff's past work of secretary provided her with skills that were transferable to the jobs of calculating machine operator, data entry clerk, and charter. (R. at 20.) Neither the VE nor the ALJ identified Plaintiff's skills or explained how they were transferable to these jobs, however. (R. at 61–64.)

As discussed, an ALJ cannot rely solely on the Guidelines when the claimant's nonexertional impairments (e.g., mental impairments) sufficiently affect her RFC. *Smith*, 2009 WL 1203407, at *9. The Fifth Circuit has held that the ALJ's exclusive reliance on the Guidelines "constitutes error" where the ALJ finds at step two that the claimant suffers from a severe mental impairment. *Loza v. Apfel*, 219 F.3d 378, 399 (5th Cir. 2000); *Hearne v. Barnhart*, 111 Fed. App' x 256, 257–58 (5th Cir. 2004) (finding error where the ALJ relied solely on the Guidelines at step five even though he found the claimant's depression to be a severe impairment under step two; explaining that "[i]n *Loza*, [the] Court linked the definition of a 'severe' impairment at Step Two to the determination of whether a claimant's nonexertional impairments significantly affected his [RFC] such that reliance solely upon the Grid Rules at Step Five would be inappropriate"). Here, at step two, the ALJ found that Plaintiff's affective and anxiety disorders were severe impairments. (R. at 12.) Accordingly, the ALJ could not rely solely on the Guidelines and was required to make an individualized step five determination with the assistance of a VE's testimony.[14] *See Loza*, 219 F.3d at 399; *Rivera*, 2010 WL 711717 at *4.

Because the ALJ found that Plaintiff, a younger individual with a high school education and skilled and semi-skilled past relevant work, was unable to perform her past relevant work, the disability determination turned on whether she had transferable skills. *See* 20 C.F.R. 404 Subpt. P. App. 2 § 201.00(h)(1)(3); *Muehling*, 2013 WL 1194078, at *5. The DOT provides a wide array of duties for the jobs of secretary, calculating machine operator, data entry clerk, and charter. Based solely on the hearing testimony and the ALJ's written decision, it is unclear which skills, if any, he

---

[14] The ALJ was required to consult VE testimony for the additional reason that he found Plaintiff was unable to perform the full range of sedentary work. *See* 20 C.F.R. 404 Subpt. P. App. 2 § 201.00(h)(1)(3).

found Plaintiff acquired in her past relevant work as a secretary that could transfer to the jobs identified by the VE. The ALJ might have reached a different disability determination if he had made the transferability findings required by SSR 82-41. Accordingly, the ALJ's error prejudiced Plaintiff's claim and remand is required.[15]

### III.  CONCLUSION

Plaintiff's motion is **GRANTED,** Defendant's motion is **DENIED,** and the case is **REMANDED** to the Commissioner for further proceedings.

**SO ORDERED** this 24th day of September, 2013.

*[signature]*
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[15] The Commissioner also argues that the ALJ's error does not warrant remand because the VE testified that given her RFC and other vocational factors, Plaintiff could still perform her past relevant work of secretary. (D. Br. at 7); (R. at 63). "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton*, 209 F.3d at 455. Here, the ALJ expressly found that Plaintiff could not perform any of her past relevant work. (R. at 19.) Accordingly, the Commissioner's argument cannot be considered.